IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANG BEE YANG, an individual, and LAU YANG, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>SUN TRUST MORTGAGE, INC., a Virginia corporation; and DOES 1 through 25, inclusive<br><br>Defendants. | 1:10-cv-01541-AWI-SKO<br><br>ORDER RE: MOTION TO DISMISS<br><br>(Doc. 57) |

## I. INTRODUCTION

Defendant SunTrust Mortgage, Inc., has filed a motion to dismiss the third amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 41(b). For reasons discussed below, the motion shall be granted in part and denied in part.

## II. FACTS AND PROCEDURAL BACKGROUND[1]

---

[1]The Court refers the parties to the orders issued March 15, 2011 (*Chang Bee Yang v. Sun Trust Mortg., Inc.,* slip copy, 2011 WL 902108 (E.D.Cal. 2011)), June 14, 2011 (*Chang Bee Yang v. Sun Trust Mortg., Inc.,* slip copy, 2011 WL 2433640 (E.D.Cal. 2011)) and August 31, 2011

On September 21, 2011, plaintiffs Chang Bee Yang and Lau Yang ("Plaintiffs") filed their third amended complaint (TAC) against defendants SunTrust Mortgage, Inc. (erroneously sued as Sun Trust Mortgage, Inc.) and Does 1 through 25, inclusive, asserting five causes of action for fraud, negligent misrepresentation, unfair business practices in violation of California Business and Professions Code Section 17200, intentional infliction of emotional distress and breach of contract. In the general allegations section of the TAC, Plaintiffs allege as follows:

> "7. On or about December 16, 2006, PLAINTIFFS and DEFENDANT SUN TRUST MORTGAGE, INC. and DOES 1 through 25, inclusive (hereinafter collectively referred to as 'DEFENDANTS') entered into a Residential Construction Loan Agreement (hereinafter 'Agreement') wherein DEFENDANTS agreed to loan and PLAINTIFFS agreed to borrow the sum of $742,450.00 . . . . [¶] 8. PLAINTIFFS acquired the loan from DEFENDANTS in order to purchase certain real property located at 10966 E. Promontory Way, Clovis CA, 93619, and to construct a residential home thereon (hereinafter referred to as the 'Project')[.] [¶] 9. PLAINTIFFS hired Sierra Custom Homes, Inc. (hereinafter referred to as 'Contractor') to construct the residential home on the property. [¶] 10. PLAINTIFFS used $200,000.00 of the loan monies to purchase the lot, and according to the Agreement, the remaining $542,450.00 was to pay for work by the Contractor."

Plaintiffs further allege:

> "11. Pursuant to the Agreement, the loan monies were to be deposited into an account with DEFENDANTS, and according to Paragraph 2 of the Agreement, the proceeds of the loan were to be advanced by DEFENDANTS at such times as Contractor reached stages of completed work. [¶] 12. However, Paragraph 7 of the Agreement required that PLAINTIFFS irrevocably appoint DEFENDANTS as PLAINTIFFS' Power of Attorney.  It also stipulated that DEFENDANTS could make all payments directly to the contractor, in disregard of other provisions of the Agreement. [¶] 13. Additionally at DEFENDANTS' request, PLAINTIFFS executed a Disbursement Authorization whereby DEFENDANTS were authorized to distribute funds directly to Contractor . . . . [¶] 14. DEFENDANTS advised PLAINTIFFS by written correspondence that DEFENDANTS were responsible for coordinating inspections and disbursing funds throughout the construction phase."

Plaintiffs further allege:

> "15. PLAINTIFFS are informed and believe, and thereon allege, that on or around January 31, 2007, MICHAEL J. CARTER ('CARTER'), a California licensed real estate appraiser, contracted with DEFENDANTS to inspect the Project on behalf of DEFENDANTS. [¶] 16. PLAINTIFFS are further informed and believe, that

(*Chang Bee Yang v. Sun Trust Mortg., Inc.,* slip copy, 2011 WL 3875520 (E.D.Cal. 2011)) for a complete chronology of the proceedings.

2

CARTER inspected the Project on or about January 31, 2007, February 13, 2007, February 26, 2007, June 26, 2007, July 9, 2007, August 3, 2007, September 7, 2007, October 15, 2007, December 27, 2007, January 18, 2008, February 8, 2008, March 14, 2008, April 21, 2008 and May 20, 2008, at the request of DEFENDANTS as DEFENDANTS' designated agent.   [¶] 17. There were fifteen (15) total Draw Requests made by Contractor.  DEFENDANTS paid each Draw Request before Plaintiffs had the opportunity to confirm that the Contractor had actually completed the work, which was the subject of each Draw Request.  DEFENDANTS secretly made the first payment to Contractor on or around January 10, 2007, in the amount of approximately $27,756.00 without Plaintiffs' knowledge or authorization. DEFENDANTS paid the other fourteen (14) subsequent Draw Requests based upon concealed inspections of DEFENDANTS' agent, CARTER, without giving PLAINTIFFS the opportunity to control, monitor and/or verify whether Contractor had actually completed the work claimed to have been completed on the Project for which funds were requested. [¶] 18. Contractor failed to complete work paid for by DEFENDANTS."

On October 12, 2011, defendant SunTrust Mortgage, Inc. (hereinafter referred to as "Defendant") filed a motion to dismiss the TAC pursuant to Federal Rules of Civil Procedure 12(b)(6) and 41(b). On November 7, 2011, Plaintiffs filed their opposition to Defendant's motion to dismiss.  On November 14, 2011, Defendant filed its reply to Plaintiffs' opposition.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Where the plaintiff fails to allege "enough facts to state a claim to relief that is plausible on its face," the complaint may be dismissed for failure to allege facts sufficient to state a claim upon which relief may be granted.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007); see Fed. R. Civ. P. 12(b)(6). "A claim has facial plausibility," and thus survives a motion to dismiss, "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1940, 173 L.Ed.2d 868 (2009).  On a Rule 12(b)(6) motion to dismiss, the court accepts all material facts alleged in the complaint as true and construes them in the light most favorable to the plaintiff.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  However, the court is not required to accept conclusory

allegations, allegations contradicted by exhibits attached to the complaint or matters properly subject to judicial notice, unwarranted deductions of fact or unreasonable inferences. *Daniels-Hall v. National Educ. Ass'n,* 629 F.3d 992, 998 (9th Cir. 2010). "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . the complaint could not be saved by amendment." *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir. 2003). The court may also dismiss an action or claim for failure to prosecute or comply with a court order. Fed. R. Civ. P. 41(b); see *Pagtalunan v. Galaza,* 291 F.3d 639, 642-43 (9th Cir. 2002).

# IV. DISCUSSION

***1. Plaintiffs' first cause of action (fraud)*** – Plaintiff's first cause of action is for fraud. In California, " 'fraud is an intentional tort, the elements of which are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. [Citation.]' [Citation.]" *Intrieri v. Superior Court,* 117 Cal.App.4th 72, 85-86, 12 Cal.Rptr.3d 97 (2004). Having reviewed the TAC in its entirety, the Court finds Plaintiffs have adequately pled only some, but not all, of the elements for actionable fraud, and therefore fail to allege facts sufficient to state a claim upon which relief may be granted.

The threshold element of fraud by intentional misrepresentation is, of course, a misrepresentation. The TAC alleges Defendant made misrepresentations to Plaintiffs on several occasions between February 2008 and June 2008. For example, Plaintiffs allege:

> "20. On February 4, 2008, Contractor issued a Draw Request to DEFENDANTS based upon work Contractor claimed to have completed on the Project ('February 2008 Draw Request')[.] [¶] 21. On or around February 8, 2008, CARTER, as DEFENDANTS' agent, at the request of DEFENDANTS, evaluated and inspected the work completed on the Project to date and subsequently completed an Inspection Report ('February 2008 Inspection Report')[.] The February 2008 Inspection Report contained the following representations as to the progress of the work completed on the project: [¶] a. Insulation: 75% complete; [¶] b. Exterior Windows and Doors: 100% complete; [¶] c. Permanent Roof: 85% complete; [¶] d. Drywall/Plaster: 100% complete; [¶] e. Interior Trim/Panel: 40% complete; and [¶] f. Interior Doors: 100% complete. [¶] 22. On or around February 8, 2008, CARTER, as DEFENDANTS' agent[,] submitted the February 2008 Inspection Report to DEFENDANTS with full

4

knowledge that he had misrepresented the amount of work completed on the Project with respect to the exterior windows and doors and the interior doors."

Plaintiffs further allege:

"23. On or around February 11, 2008, DEFENDANTS knew that the February 2008 Inspection Report contained misrepresentations as to the progress of the work completed on the Project to date with respect to the exterior windows and doors and the interior doors. [¶] 24. Notwithstanding this fact, on or around February 11, 2008, DEFENDANTS paid Contractor $27,158.35 in accordance with the misrepresentations contained within the February 2008 Inspection Report."

Plaintiffs further allege:

"25. On or around February 11, 2008, DEFENDANTS knowingly and intentionally misrepresented to PLAINTIFFS the amount of work completed on the Project to date by submitting written correspondence to PLAINTIFFS via U.S. Mail . . . , wherein DEFENDANTS represented to PLAINTIFFS that DEFENDANTS had issued a payment to Contractor in the amount of $27,158.35 as a result of the progress of the work on the Project which had been completed, including: [¶] a. Insulation: 100% complete; [¶] b. Exterior Windows and Doors: 100% complete; [¶] c. Permanent Roof: 100% complete; [¶] d. Drywall/Plaster: 100% complete; [¶] e. Interior Trim/Panel: 40% complete; and [¶] f. Interior Doors: 100% complete."

Plaintiffs further allege:

"26. In addition, on or around February 15, 2008, DEFENDANTS issued a mortgage statement to PLAINTIFFS via U.S. mail to PLAINTIFFS' residence located at 2343 S. Hughes Avenue, Fresno, California 93706, wherein DEFENDANTS demanded that Plaintiffs submit an interest only payment (calculated at the rate of 9.25%) to DEFENDANTS on or before March 1, 2008, in the amount of $4,409.28, based upon the loan monies advanced for the Project to date in the amount of $607,151.90 ('February 2008 Mortgage Statement')[.] [¶] 27. The amount of monies advanced for the Project to date in the amount of $607,151.90 included the amount of $27,158.35 advanced to Contractor for work that had not yet been completed on the Project."

According to Plaintiffs, Defendant's representations regarding the work were untrue:

"29. DEFENDANTS' representations to PLAINTIFFS as to the progress of the work completed on the Project to date were false. In reality, as of February 11, 2008, the progress of the work completed on the Project was as follows: [¶] a. Insulation: not complete; [¶] b. Exterior Windows and Doors: not complete, Contractor had placed stucco over four (4) windows, one (1) pair of inside doors, one (1) pair of front doors, and one (1) exterior door. No doorknobs had been supplied or installed. Garage doors and openers had not been supplied or installed; [¶] c. Permanent Roof: not complete; [¶] d. Drywall/Plaster: 100% complete; [¶] e. Interior Trim/Panel: not complete; and [¶] f. Interior Doors: not complete, Contractor had not supplied or installed one (1) pair of interior double doors. No doorknobs had been supplied or installed. [¶] 30. . . . [T]he principal amount of the loan to date used to calculate PLAINTIFFS' interest payment should have been much lower, as the amount of $27,158.35 added to the loan amount for purposes of calculating the March 1, 2008, payment DEFENDANTS represented to be due by PLAINTIFFS included payment

5

to the Contractor for work which had not yet been completed on the interior doors, exterior windows, exterior doors, and permanent roof."

These allegations sufficiently allege misrepresentations by Defendants. Federal Rule of Civil Procedure 9(b) requires that, in alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To comply with Rule 9(b), allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so they can defend against the charge and not just deny that they have done anything wrong.' [Citation.]" *Bly-Magee v. California,* 236 F.3d 1014, 1019 (9th Cir. 2001). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged. [Citation.] '[A] plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false.' [Citation.]" *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003); see also *Lazar v. Superior Court,* 12 Cal.4th 631, 645, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996). The TAC alleges what the misrepresentations were, to whom Defendant made them (Plaintiffs), when and where they were made (by correspondence submitted through U.S. mail on February 11, 2008) and how they were tendered (through the concomitant representation that the $27,158.35 Defendant disbursed to the contractor was for completed work).

Plaintiffs have also alleged facts establishing Defendant's intent to defraud. "Intent to defraud is defined as the intent to induce reliance on a knowing misrepresentation or omission." *Moss v. Kroner,* 197 Cal.App.4th 860, 129 Cal.Rptr. 3d 220 (2011) (citing *Apollo Capital Fund v. Roth Capital Partners,* 158 Cal.App.4th 226, 257, 70 Cal.Rptr.3d 199 (2007)). The TAC alleges Defendant "intended to induce PLAINTIFFS to rely on the February 2008 correspondence and the February 2008 Mortgage Statement, so that PLAINTIFFS would pay accrued interest on the monies disbursed to date in the amount of $607,151.90, despite the fact that the principal amount of the loan to date used to calculate PLAINTIFFS' interest payment should have been much lower, as the amount of $27,158.35 added to the loan for the purposes of calculating the March 1, 2008, payment DEFENDANTS represented to be due by PLAINTIFFS included payment to the Contractor for work

which had not yet been completed on the interior doors, exterior windows, exterior doors, and permanent roof." Because Plaintiffs allege Defendant made the misrepresentations to induce them to make an accrued interest payment based on disbursements for work Defendant knew had not been completed by the contractor, Plaintiffs adequately plead intent to defraud.

Plaintiffs have also adequately pled their justifiable reliance. "Actual reliance occurs when a misrepresentation is ' "an immediate cause of [a plaintiff's] conduct, which alters his legal relations," ' and when, absent such representation, ' "he would not, in all reasonable possibility, have entered into the contract or other transaction." ' [Citations.]" *Engalla v. Permanente Medical Group, Inc.,* 15 Cal.4th 951, 976, 64 Cal.Rptr.2d 843, 938 P.2d 903 (1997). Plaintiffs establish this element by alleging they "rel[ied] on the February 2008 Correspondence and the February 2008 Mortgage Statement by making the March 2008 interest-only payment (and all preceding and subsequent payments) of $4,409.28 without question," and that they would not have made the interest-only payments as required absent Defendant's representations. Plaintiffs have also established the ultimate element of damages by alleging, "[a]s a direct and proximate result of DEFENDANTS' fraud, PLAINTIFFS paid additional sums of money to DEFENDANTS on or around March 1, 2008, in the form of an inflated interest-only payment in the amount of $4,409.28, in accordance with the February 2008 Mortgage Statement issued by DEFENDANTS, based upon the February 2008 Mortgage Statement issued by DEFENDANTS, based upon the incorrect principal loan amount to date of $607,151.90, which was calculated upon the amount of monies paid to Contractor as a result of the February 2008 Draw Request and the February 2008 Inspection Report."

In its motion, Defendant contends Plaintiffs could not have justifiably relied on its representations because the residential construction loan agreement expressly provides that each draw request submitted to Defendant by the contractor "shall be deemed acceptance by the Borrower of the Work completed to date, and concurrence with the amount requested" and "that Lender has no obligation to monitor or control the Work." Not so. These contractual provisions are not fatally inconsistent with Plaintiffs' reliance on Defendant's representations that the disbursement of

$27,158.35 to the contractor was based on a certain percentage of completed work, particularly in light of another provision in the agreement stating "[t]he proceeds of the Loan and any funds held in the Account shall be advanced at such times as Contractor has reached stages of completed Work in accordance with the Work Schedule or Contract."  While the language of the agreement appears to preclude Plaintiffs' reliance on Defendant's statements as a measure of the work completed by the contractor, nothing suggests Plaintiffs could not have justifiably relied on those statements in deciding whether to pay the $4,409.28 in interest Defendant demanded of them.

Nevertheless, the Court finds Plaintiffs have failed to comply with the standard for pleading fraud in attempting to establish Defendant's knowledge of falsity.  A complaint for fraud by intentional misrepresentation "may allege either 'the [defendant's] actual knowledge of the false or baseless character of its opinion' or the [defendant] had ' "no belief in the truth of the statement, and [made] it recklessly, without knowing whether it is true or false . . . ." ' " *Nutmeg Securities, Ltd., v. McGladrey & Pullen,* 92 Cal.App.4th 1435, 1448, 112 Cal.Rptr.2d 657 (2001) (fn. omitted). Plaintiffs allege conclusorily that Defendant "knew that the February 2008 Inspection Report contained misrepresentations" and "knowingly misrepresented to PLAINTIFFS the amount of work completed on the project, as well as the amount of interest that was to be paid by PLAINTIFFS to DEFENDANTS on or before March 1, 2008," but allege no facts establishing Defendant knew its statements were untrue or made them with reckless disregard for their truth or falsity.

Plaintiffs theorize the appraiser's knowledge of the contractor's fraudulent draw requests is imputable to Defendant because the appraiser was acting as Defendant's agent.  Under the doctrine of imputed knowledge, "[a] principal is chargeable with and is bound by the knowledge of, or notice to, his agent received while the agent is acting within the scope of his authority and which is with reference to a matter of which his authority extends." *Columbia Pictures Corp. v. De Toth*, 87 Cal.App.2d 620, 630, 197 P.2d 580 (1948); see Cal. Civ. Code, § 2332 ("As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other").  "The fact that

the knowledge acquired by the agent was not actually communicated to the principal . . . does not prevent operation of the rule." *De Toth, supra,* at p. 630; see *O'Riordan v. Federal Kemper Life Assurance Co.,* 36 Cal.4th 281, 288, 30 Cal.Rptr.3d 507, 114 P.3d 753 (2005). But the facts must support the existence of a principal-agent relationship; mere references to "principals" and "agents" do not suffice. *Workman v. City of San Diego,* 267 Cal.App.2d 36, 39, 72 Cal.Rptr. 509 (1968).

In its August 31, 2011 order granting Defendant's motion to dismiss the fraud claim in the second amended complaint with leave to amend, the Court concluded Plaintiffs had failed to allege facts supporting the existence of a principal-agent relationship between Defendant and the appraiser: "Plaintiffs have not alleged facts establishing that Carter was an 'agent' of SunTrust. Plaintiffs only make the conclusory allegations that Carter was an agent. [Citation.] [¶] From the [second amended complaint], it appears that Carter was an independent contractor and not an employee of SunTrust. An independent contractor is also an agent when it 'contracts to act on behalf of another and subject to the other's control, except with respect to his physical conduct[.]' [Citation.] Since Plaintiffs are basing their fraud claims on Carter's imputed knowledge to SunTrust, Plaintiffs were required to allege facts showing that Carter was an agent. Any amended fraud claim must include factual allegations establishing that Carter was an agent of SunTrust." *Chang Bee Yang v. Sun Trust Mortg., Inc.,* slip copy, 2011 WL 3875520 at *4, fn. 3. Plaintiffs have not rectified these defects in the TAC, choosing instead to rely on conclusory allegations the appraiser was "Defendant's agent."

Because Plaintiffs have offered no facts establishing Defendant's knowledge of falsity or supporting the existence of a principal-agent relationship between Defendant and the appraiser, Defendant's motion to dismiss the first cause of action for fraud must be granted.

***2. Plaintiffs' second cause of action (negligent misrepresentation)*** – Plaintiff's second cause of action is for negligent misrepresentation. In California, the same elements for fraud by intentional misrepresentation comprise a cause of action for negligent misrepresentation, except there is no requirement for knowledge of falsity or intent to defraud. *Small v. Fritz Companies, Inc.,* 30

Cal.4th 167, 173, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (2003).  The tort "encompasses '[t[he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true' ([Cal.] Civ. Code, § 1710, subd. 2), and '[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true' ([Cal.] Civ. Code, § 1572, subd. 2; see *Fox v. Pollack* (1986) 181 Cal.App.3d 954, 962, 226 Cal.Rptr. 532 [describing elements of the tort])."  *Small, supra,* at p. 174.  Having reviewed the TAC in its entirety, the Court finds Plaintiffs have failed to allege facts sufficient to state a claim upon which relief may be granted.  Plaintiffs' negligent misrepresentation claim is grounded in the same set of facts as their fraud claim.  However, they have not pled facts establishing Defendant made its misrepresentations without reasonable ground for believing them to be true.   Accordingly, Defendant's motion to dismiss the second cause of action for negligent misrepresentation must be granted.

### 3. Plaintiffs' third cause of action (unfair business practices in violation of California Business and Professions Code Section 17200) –

Plaintiff's third cause of action is for unlawful business practices in violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 et seq.  "In order to state a claim for a violation of the [UCL], a plaintiff must allege that the defendant committed a business act that is either fraudulent, unlawful, or unfair."  *Levine v. Blue Shield of California,* 189 Cal.App.4th 1117, 1136, 117 Cal.Rptr.3d 262 (2010).  The purpose of the UCL "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services."  *Kasky v. Nike, Inc.,* 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296, 45 P.3d 243 (2002).   " 'Because [the UCL] is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent.  "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' "  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999).

Under this cause of action, Plaintiffs refer to the allegations set forth under the first cause of

action for fraud, and allege that Defendant's act of demanding inflated interest-only payments from borrowers based on disbursements to contractors for work that it knew had not actually been completed constitutes an unlawful and fraudulent business practice.  An unlawful business practice is one that " 'is forbidden by any law' " (*Olszewski v. Scripps Health,* 30 Cal.4th 798, 827, 135 Cal.Rptr.2d 1, 69 P.3d 927 (2003)), and "[v]irtually any law – federal, state or local – can serve as a predicate for a section 17200 action" (*State Farm Fire & Casualty Co. v. Superior Court,* 45 Cal.App.4th 1093, 1102-03, 53 Cal.Rptr.2d 229 (1996) (abrogated on other grounds by *Cel-Tech Communications, Inc., supra,* 20 Cal.4th at 180)).  " '[A] fraudulent business practice is one that is likely to deceive members of the public.' [Citation.]  'A claim based upon the fraudulent business practice prong of the UCL is "distinct from common law fraud.  'A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages.  None of these elements are required to state a claim for . . . relief' under the UCL. [Citations.] This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." ' [Citation.] A fraudulent business practice ' " 'may be accurate on some level, but will nonetheless tend to mislead or deceive . . . . A perfectly true statement couched in such a manner that is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under' " the UCL.' [Citation.]" *Boschma v. Home Loan Center, Inc.,* 198 Cal.App.4th 230, 252-53, 129 Cal.Rptr.3d 874 (2011).  Having reviewed the TAC in its entirety, the Court finds Plaintiffs have failed to allege facts sufficient to plead a violation of the UCL's unlawful or fraudulent prongs.

Plaintiffs' claim under the unlawful prong of the UCL is duplicative of their common law fraud cause of action.  But as the Court concluded in its analysis of the fraud claim above, Plaintiffs have failed to allege facts sufficient to establish Defendant's knowledge of falsity.  As a result, they cannot adequately plead a UCL claim premised on fraud under the unlawful prong.

Failure to establish Defendant's knowledge of falsity does not preclude Plaintiffs from stating

11

a UCL claim under the fraudulent prong: While common law fraud, as noted above, requires allegations of actual falsity, knowledge of falsity and reasonable reliance, the fraudulent prong does not. *Boschma, supra,* 198 Cal.App.4th at 230. However, a plaintiff must nonetheless allege why "members of the public are likely to be deceived" by the defendant's allegedly fraudulent business practice. *Kasky, supra,* 27 Cal.4th at 949; see *Boschma, supra,* at p. 230. "The determination as to whether a business practice is deceptive is based on the likely effect such practice would have on a reasonable consumer." *McKell v. Washington Mut., Inc.,* 142 Cal.App.4th 1457, 1471, 49 Cal.Rptr.3d 227 (2006). No cause of action lies if the court can determine as a matter of law that, contrary to the allegations, members of the public were not likely to be deceived or misled by the defendant's conduct. *Day v. AT&T Corp.,* 63 Cal.App.4th 325, 333, 74 Cal.Rptr.2d 55 (1998).

Plaintiffs allege that "borrowers of DEFENDANTS are likely to be deceived by DEFENDANTS' misrepresentations, via monthly mortgage statements, as to the actual progress of work being performed on a project, thereby resulting in financial loss to borrowers in the form of inflated interest and/or principle [sic] payments and the depletion of loan funds when unnecessary loan funds are intentionally distributed and exhausted on behalf of borrowers by DEFENDANTS for work which has not yet been completed." Problematically for Plaintiffs, paragraph 5 of the loan agreement specifically states that "Lender has the right, but not the obligation, during construction of the Improvements, to inspect the same . . . . Such inspections shall be deemed to be for the benefit of the Lender only and shall create no liability or responsibility to any person or entity. The parties expressly acknowledge that Lender has no obligation to monitor or control the work." The agreement further states that "NOTHING, INCLUDING, WITHOUT LIMITATION, APPROVAL OF ANY PLANS AND SPECIFICATIONS OR WORK, ANY DISBURSEMENT HEREUNDER OR THE DEPOSIT OR ACCEPTANCE OF ANY DOCUMENTS OR INSTRUMENT, SHALL BE CONSTRUED AS A REPRESENTATION, WARRANTY OR WAIVER, EXPRESS OR IMPLIED, AS TO KIND, QUALITY, VALUE, MARKETABILITY OR FITNESS FOR ANY PURPOSE OF THE IMPROVEMENTS, ON LENDER'S PART." Moreover, Plaintiffs agreed that

they would provide Defendant "with satisfactory evidence . . . that construction shall comply with applicable zoning, building, use and occupancy codes, and restrictions."  In other words, under the terms of the loan agreement, the responsibility for determining the "actual progress of work" rested with Plaintiffs (i.e., the borrowers), not Defendant.  Under these circumstances, Plaintiffs cannot allege as a matter of law that reasonable consumers are likely to be misled by any misrepresentations concerning the actual progress of work in Defendant's monthly mortgage statements.

Plaintiffs further allege the loan agreement was unconscionable – and therefore unfair – because it "consist[ed] of more than ten (10) pages of single-spaced font containing legal terms and jargon;" Plaintiffs "were not allowed to negotiate the terms of the [a]greement"; "a large disparity in bargaining power" existed between Plaintiffs and Defendants; Plaintiffs were presented with a large stack of loan documents and told simply to " 'sign here' "; and Defendants placed on Plaintiffs "the burden to control, monitor, and verify the Contractor's work and disclaimed responsibility to do so." In California, " 'unconscionability has both a "procedural" and a "substantive" element,' the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided' results. [Citation.]"  *Armendariz v. Foundation Health Psychcare Services, Inc.,* 24 Cal.4th 83, 114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000).  " 'Oppression' arises from an inequality of bargaining power which results in no real negotiation and 'an absence of meaningful choice.' [Citations.] 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms. [Citations.]" *A & M Produce Co. v. FMC Corp.,* 135 Cal.App.3d 473, 486, 186 Cal.Rptr. 114 (1982). " 'Substantive unconscionability' focuses on the terms of the agreement and whether those terms are 'so one-sided as to "shock the conscience." ' [Citations.]" *Kinney v. United HealthCare Services, Inc.,* 70 Cal.App.4th 1322, 1330, 83 Cal.Rptr.2d 348 (1999) (emphasis omitted). " 'The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. 'Essentially a sliding

scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz, supra,* at p. 114.

In this case, the loan agreement is neither procedurally nor substantively unconscionable. First, the agreement itself compels the Court to reject Plaintiffs' allegations of unconscionability. While the font size is small (approximately 10 point or so), it is easily legible to persons of ordinary vision. The size, typeface and line spacing are uniform throughout the agreement, meaning the challenged provisions are no more difficult to read than any other provisions. Those provisions are also located in the main body of the agreement, under separate sections with bold-faced headings entitled "Procedure for Construction Advances" and "Right of Inspection"; they are not inconspicuously buried in the agreement so as to be unnoticeable to Plaintiffs. Second, Plaintiffs have not alleged facts establishing the circumstances under which they were presented with the agreement. Plaintiffs have also not alleged facts establishing what the relative bargaining power of the parties was. Therefore, they have failed to demonstrate the agreement was oppressive. Although Plaintiffs contend they were unable to negotiate over the terms and conditions of the agreement if they wanted a loan from Defendant, there were presumably other lenders who would have entered into a construction loan agreement with them. Third, the provisions placing the burden on Plaintiffs to control, monitor and verify the contractor's work and disclaiming any responsibility to do so on the part of the Defendant do not "shock the conscience." Defendant loaned money at interest to Plaintiffs on the security of their property. Therefore, it was reasonable for the parties to agree that Defendant had no duty to conduct inspections for Plaintiffs' benefit, and that Defendant's right of inspection was only to protect its interest, not Plaintiffs' interest, in the security. Furthermore, Plaintiffs, as the owner of the property and the party agreeing to maintain the Project's plans and specifications, were in a better position than Defendant to monitor the progress of the Project's

14

construction, thereby ensuring the contractor had met his obligations to them.

Because Plaintiffs have not alleged facts establishing that Defendant's business practices were unlawful, fraudulent or unfair, Defendants' motion to dismiss the third cause of action for violation of the UCL must be granted.

***4. Plaintiffs' fourth cause of action (intentional infliction of emotional distress)*** – In their opposition, Plaintiffs concede the fourth cause of action for intentional infliction of emotional distress.  Accordingly, Defendant's motion to dismiss this cause of action is granted.

***5. Plaintiffs' fifth cause of action (breach of contract)*** – Plaintiffs' fifth and final cause of action is for breach of contract.  In California, the elements of a cause of action for breach of contract are (1) the existence of a contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach and (4) resulting damages to the plaintiff.  *Oasis West Realty, LLC v. Goldman,* 51 Cal.4th 811, 821, 124 Cal.Rptr.3d 256, 250 P.3d 1115 (2011).  "If the action is based on alleged breach of a written contract, the terms must be set out verbatim in the body of the complaint or a copy of the written agreement must be attached and incorporated by reference."  *Harris v. Rudin, Richman & Appel,* 74 Cal.App.4th 299, 307, 87 Cal.Rptr.2d 822 (1999).

Under this cause of action, Plaintiffs first allege Defendant breached the terms of an allonge to the promissory note presumably executed by Plaintiffs by failing to convert their construction loan into a permanent loan upon completion of the Project's construction.  In its August 31, 2011 order granting Defendant's motion to dismiss the breach of contract cause of action in Plaintiffs' second amended complaint with leave to amend, the Court concluded the allegations were "unclear as to what [Defendant's] obligations were under the Allonge . . . . The mere fact that Plaintiffs  allege that the Allonge states that the Note represents both a construction loan and a permanent loan does not indicate that [Defendant] was required to convert the construction loan to a permanent loan upon completion of the construction project."  *Chang Bee Yang v. Sun Trust Mortg., Inc.,* slip copy, 2011

WL 3875520 at *12.  Plaintiffs have failed to rectify these defects in the TAC.

Plaintiffs direct the Court to provisions in the allonge stating: (1) " 'Permanent Mortgage Date' is the date when the Construction Period ends and the Note and Security Instrument become a permanent mortgage loan;" (2) "[d]uring the Construction Period, I [Borrower] will pay interest only on the amount of principal advanced at the rate stated in the Note;" and (3) "[b]eginning on the Permanent Mortgage Date, interest shall accrue and monthly payments of principal and interest shall be due and payable as stated in the Note."  (A copy of the allonge is attached as an exhibit to the TAC.)  Aside from the language of the allonge, Plaintiffs reproduce selected portions of their deed of trust, promissory note and supplemental closing instructions (none of which are attached as exhibits to the TAC).  As to these documents, Plaintiffs allege as follows:

> "Section E of the Deed of Trust states, 'Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full [n]ot later than January 1, 2036.' [¶] Section 3.A of the Fixed/Adjustable Rate Note states, 'I will pay principal and interest by making a payment every month.  I will make my monthly payments on the first day of each month beginning on February, 2007.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  If, on January 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date which is called the 'Maturity Date' [¶] Section 1 of the Supplemental Closing Instructions confirms, among other information, that the term of the Loan is 360 months less the Construction Period of 12 months (Permanent Loan Period of 348 months); the First Payment Date (of the Construction Phase) was February 1, 2007; and the Final Payment Date (of the Permanent Phase) will be January 1, 2036."

From this, Plaintiffs assert it was "obvious" Defendant had an affirmative obligation under the allonge to convert the construction loan into a permanent loan upon the Project's completion.  The Court disagrees.  At most, the allegations establish Plaintiffs' loan was structured to allow for the loan's conversion into some sort of permanent financing.  However, Plaintiffs have not pointed to any provision in the promissory note, loan agreement or any other document constituting Defendant's agreement to convert the construction loan secured by the promissory note into a permanent loan.  The foregoing allegations are simply too vague and generalized to support the existence of any such agreement by Defendant, particularly where, as here, Plaintiffs have not explained what Defendant's alleged breach entailed or what changes in the loan terms (e.g., rate of

interest, amount of monthly payments, etc.) the conversion was intended to effectuate.   Even engaging in inferences most favorable to Plaintiffs, as required on a motion to dismiss, the Court fails to discern what exactly Defendant was obligated to do but ultimately did not.   Accordingly, to the extent Plaintiffs seek to predicate their breach of contract claim on an alleged breach of the promissory note allonge, Defendant's motion to dismiss this claim must be granted.

Plaintiffs further allege they had an implied-in-fact contract with Defendant wherein Defendant impliedly represented to Plaintiffs, by conducting site inspections of the Project on a regular basis, that it would verify the amount of work completed on the Project to ensure only payments for work actually completed on the Project would be disbursed to the contractor from the loan proceeds.   Plaintiffs allege Defendant breached this implied-in-fact contract by disbursing loan proceeds to the contractor without first obtaining satisfactory proof that the work claimed in the contractor's draw requests had in fact been completed.   In the Court's view, this particular claim is barred by the terms of the loan agreement.

In an action based on contract, the general rules of contract interpretation apply.   " ' "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties.   'Under the statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citations.]" ' " *Minich v. Allstate Ins. Co.,* 193 Cal.App.4th 477, 485, 122 Cal.Rptr.3d 769 (2011).   "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."   Cal. Civ. Code, § 1636.   "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."   Cal. Civ. Code, § 1638.

According to the allegations, Plaintiffs executed an authorization form allowing Defendant to disburse construction funds directly to the contractor during the Project's construction phase.   The disbursement authorization, a copy of which is attached as an exhibit to the TAC, provides in

pertinent part: "Borrower and Builder acknowledge that Lender will advance funds in accordance with this Disbursement Authorization upon Lender's receipt of verbal or written requests from either Borrower and/or Builder.  All such disbursements will be in accordance with the loan Agreement signed by the borrower in connection with the Construction loan."  And, to briefly review, in paragraphs 2 and 5 of the agreement, Defendant disclaims any obligation to monitor or assure the contractor's satisfactory performance of its contract with Plaintiffs before disbursing funds:

"2. **Procedure for Construction Advances.**  Lender shall have no obligation, either express or implied, to Borrower or to any third parties, to verify that advances made hereunder are actually used to pay for labor or materials used in connection with the construction of the Improvements.  Borrower understands that if amounts properly owing are not actually paid, subcontractors, artisans, laborers, or materialmen may file liens against the Property.  Borrower understands that Borrower has selected Contractor, and thereby agrees to assume all risks in the event Contractor fails to pay for all labor and material furnished, or otherwise fails to perform under the Contract.

. . . .

**5. Right of Inspection**.  Borrower shall furnish Lender with a complete duplicate set of Plans and Specifications.  Lender has the right, but not the obligation, during construction of the Improvements, to inspect the same and require to be repaired or replaced, at Borrower's expense, any material or workmanship that does not comply with the Plans and Specifications.  Such inspections shall be deemed to be for the benefit of Lender only and shall create no liability or responsibility to any person or entity.  The parties expressly acknowledge that Lender has no obligation to monitor or control the Work.  Lender's agreement to advance funds under this Agreement is expressly conditioned upon its continuing right to inspect the Property. [¶] Lender may inspect the Property at any reasonable time to determine the progress and quality of the Work and the condition of the Improvements.  Lender shall not be liable for the performance or default of Contractor or any subcontractors, artisans, laborers or materialmen, for any failure to construct, complete, protect or insure the Improvements or materials, for the payment of any cost or expense incurred in connection therewith, or for the performance or non-performance of any obligation of Borrower or Contractor.  NOTHING, INCLUDING WITHOUT LIMITATION, APPROVAL OF ANY PLANS AND SPECIFICATIONS OR WORK, ANY DISBURSEMENT HEREUNDER OR THE DEPOSIT OR ACCEPTANCE OF ANY DOCUMENT OR INSTRUMENT, SHALL BE CONSTRUED AS A REPRESENTATION, WARRANTY, OR WAIVER, EXPRESS OR IMPLIED, AS TO KIND, QUALITY, VALUE, MARKETABILITY OR FITNESS FOR ANY PURPOSE OF THE IMPROVEMENTS, ON LENDER'S PART.  Irrespective of a default under the Contract or work agreement by Contractor or for its failure to complete or perform all Work required of it under the Contract, Borrower shall have no right of offset, counterclaim or defense against Lender because of any claim Borrower may have against Contractor or any other person or entity."

" ' "There cannot be a valid express contract and an implied contract, each embracing the same

subject, but requiring different results." [Citation.]' [Citations.]" *Slivinsky v. Watkins-Johnson Co.,* 221 Cal.App.3d 799, 806, 270 Cal.Rptr. 585 (1990).  The loan agreement provides that Plaintiffs, not Defendant, would bear the risk of the contractor's failure to apply the loan proceeds to the cost of construction, and that the responsibility for determining whether work was complete rested with Plaintiffs.  Because the language of the loan agreement conflicts with the allegation Defendant had an implied contractual duty to verify the amount of work completed on the Project to ensure only payments for work actually completed on the Project would be disbursed to the contractor from the loan proceeds, Plaintiffs' claim for breach of an implied-in-fact contract fails.

The allegation that Defendant conducted site inspections of the Project on a regular basis does not alter this conclusion.  *Meyers v. Guarantee Sav. & Loan Assn.,* 79 Cal.App.3d 307, 144 Cal.Rptr. 616 (1978) is instructive as to why.

To construct a house on property they owned in Mariposa County, the Meyers took out a $20,000 loan from Guarantee Savings and Loan Association ("Guarantee"), the terms and conditions of which were contained in a building loan agreement.  *Meyers, supra,* at p. 309.  The Meyers executed a disbursement form authorizing Guarantee to deposit the loan proceeds in a special non-interest bearing account and disburse them to Francis Asbury, the building contractor, whenever Asbury submitted signed vouchers indicating certain work had been completed on the house.  *Id.* Under the loan agreement, the Meyers promised to inspect the property and notify Guarantee if the construction was not satisfactory.  Guarantee was entitled to inspect the property to determine if work was progressing satisfactorily, although the agreement expressly provided that Guarantee did not assume the duties of a contractor or architect and was not required to make inspections.  *Id.* Eventually, the Meyers became dissatisfied with Asbury's departures from the building specifications and refused to keep paying him.  *Id.* at 310.  Asbury then filed a complaint to foreclose a mechanic's lien on the property.  The Meyers answered and cross-complained against Asbury, the surety on Asbury's contractor's bond and Guarantee, alleging Guarantee had made payments to Asbury when it knew or should have known the work had not been done according to specifications

1   or that certain expenses claimed in Asbury's vouchers had not been incurred.  *Id*.  The trial court

2   granted summary judgment in favor of Guarantee, and the Court of Appeal affirmed.  *Id.*

3         On appeal, the Meyers argued Guarantee owed them a duty to regularly inspect the

4   construction of the house to verify that Asbury was complying with the building's plans and

5   specifications.  *Meyers, supra,* 79 Cal.App.3d at 310.  The court disagreed, pointing out that under

6   the terms of the building loan agreement, it was the Meyers' duty to inspect the construction and

7   notify Guarantee if any part was unsatisfactory, and that any inspections conducted by Guarantee –

8   which Guarantee had no duty to undertake – were solely for its own benefit.  *Id*. at 311.  The court

9   further rejected the Meyers' argument that Guarantee was their agent and therefore owed them a

10   fiduciary duty to inspect the ongoing construction and report any departures from specifications.  The

11   court acknowledged the existence of an agency relationship, but explained that the scope of the

12   relationship was delimited by the terms of the loan agreement, which did not impose on Guarantee

13   any affirmative obligation to inspect the property on the Meyers' behalf.  *Id*. at 312.

14         In this case, Plaintiffs have not alleged facts showing Defendant undertook to do anything

15   more than what it was already obligated to do under the terms of the loan agreement.  Although

16   Plaintiffs allege Defendant impliedly agreed to verify the amount of work represented in the

17   contractor's draw requests by conducting site inspections of the Project on a regular basis, Defendant

18   had a right to conduct inspections under the agreement.  That right, as noted above, was permissive

19   and intended solely for Defendant's protection and benefit.  Therefore, the mere allegation Defendant

20   conducted site inspections of the Project on a regular basis does not mean Defendant assumed a duty

21   to protect Plaintiffs' interest by verifying the representations in the draw requests.  Any such duty

22   would impose on Defendant the duty of a fiduciary, which has been rejected by California authority.

23   See *Meyers, supra,* 79 Cal.App.3d at 312; see also *Nymark v. Heart Fed. Savings & Loan Assn.,* 231

24   Cal.App.3d 1089, 1096, 283 Cal.Rptr.53,  (1991) ("[A]s a general rule, a financial institution owes

25   no duty of care to a borrower when the institution's involvement in the loan transaction does not

26   exceed the scope of its conventional role as a mere lender of money").  Courts have recognized a

27

28                                    20

financial institution may owe fiduciary duties to a borrower where its financing activity extends beyond that of a conventional lender.  See *Kim v. Sumitomo Bank,* 17 Cal.App.4th 974, 979-81, 21 Cal.Rptr.2d 834 (1993) (relationship between borrower and lender is typically not fiduciary in nature unless the borrower can demonstrate a special relationship or circumstances giving the lender/borrower relation a fiduciary character).  Nothing in the TAC, however, suggests this was the case here.  Thus, to the extent Plaintiffs seek to predicate their breach of contract claim on breach of an alleged implied-in-fact contract, Defendant's motion to dismiss this claim must be granted.

Nevertheless, the Court finds Plaintiffs have stated a claim for breach of the loan agreement by alleging Defendant disbursed loan proceeds to the contractor for work that had not yet been completed.  With regard to disbursements, the agreement, while perhaps clear and explicit in other respects, provides rather ambiguously: "The proceeds of the Loan . . . shall be advanced at such times as Contractor has reached stages of *completed* Work in accordance with the Work Schedule or Contract . . . . The advances shall be delivered by Lender based upon progress made in the Work, in such amounts and at such times as Lender, in its discretion, determines as being reasonable based upon inspection made from time to time by Lender or its agent." (Emphasis added.)  Construing this language in favor of Plaintiffs and against Defendant, the agreement required Defendant to disburse funds to the contractor only for completed work it deemed to be reasonable.  The allegation Defendant disbursed funds for *uncompleted* work alleges a breach of this contractual duty.

In its motion, Defendant suggests it had an obligation (or at least the discretion) to approve every draw request submitted by the contractor, no matter how false or inaccurate, because the loan agreement provides that "[e]ach draw request shall be deemed acceptance by Borrower of the Work completed to date, and concurrence with the amount requested."  By Defendant's theory, then, a construction lender is entitled to disburse funds indiscriminately to a building contractor who has not done even a single item of work on the project for which the loan was procured.  The Court disagrees.  If nothing else, the covenant of good faith and fair dealing, which is implicit in every contract (*Cates Construction, Inc. v. Talbot Partners,* 21 Cal.4th 28, 43, 86 Cal.Rptr.2d 855, 980

P.2d 407 (1999)), required Defendant to insist upon accurate draw requests from the contractor. Moreover, the loan agreement allowed Defendant to refuse disbursement whenever there was some indication the draw requests were erroneous.

Defendant further suggests Plaintiffs cannot fault Defendant for disbursing loan proceeds to the contractor for uncompleted work because Defendant was not required to verify the amount of work represented in the draw requests or inspect the Project to ensure the work was actually completed. Defendant correctly observes that under the loan agreement, it had no duty to do either of these things, and any inspections it did conduct were for its own benefit, not the benefit of Plaintiffs. Defendant also correctly observes that under the loan agreement, the responsibility for determining the actual progress of work lay with Plaintiffs. Problematically for Defendant, it is well established that "any contract must be construed as a whole, with the various individual provisions interpreted together so as to give effect to all, if reasonably possible or practicable." *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal.App.4th 447, 474, 80 Cal.Rptr.2d 329 (1998). Defendant's argument, in essence, is that the part of the loan agreement disclaiming any obligation to monitor or assure the contractor's satisfactory performance trumps the part of the agreement that it disburse funds to the contractor only for completed work. The Court rejects this argument in favor of an interpretation that gives effect to all parts of the loan agreement. Accordingly, the Court finds Plaintiffs have alleged facts sufficient to state a claim upon which relief for breach of contract may be granted, and Defendant's motion to dismiss the breach of contract cause of action must be denied.

## V. DISPOSITION

Based on the foregoing, the motion of defendant SunTrust Mortgage, Inc., to dismiss the first, second, third and fourth causes of action for fraud, negligent misrepresentation, unfair business practices in violation of California Business and Professions Code Section 17200 and intentional

infliction of emotional distress, respectively, in the third amended complaint is GRANTED without leave to amend.  The motion of defendant SunTrust Mortgage, Inc., to dismiss the fifth cause of action for breach of contract in the third amended complaint is DENIED.

IT IS SO ORDERED.

Dated:  ___December 22, 2011___                    _____

                                                   CHIEF UNITED STATES DISTRICT JUDGE